**UNITED STATES of America,
Appellee,
v.
Clarence C. ELMORE, Appellant.
No. 13067.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1969.

Decided March 16, 1970.

As Modified on Denial of Rehearing
April 29, 1970.

"(3) The removal of the registrant would cause a material loss of effectiveness in such activity."

Robert G. Perry, Charleston, W. Va. (Owen Griffith and Walter Burton, Princeton, W. Va., on the brief), for appellant.

John M. Brant, Atty., Dept. of Justice (Johnnie M. Walters, Asst. Atty. Gen., Joseph M. Howard, Atty., Dept. of Justice, and Wade H. Ballard, III, U. S. Atty., on the brief), for appellee.

Before WINTER and CRAVEN, Circuit Judges, and HARVEY, District Judge.

WINTER, Circuit Judge:

Clarence C. Elmore has appealed from the judgment entered on his conviction for violation of 26 U.S.C.A. § 7201. He was indicted in two counts of wilfully attempting to evade federal income taxes by filing false and fraudulent returns which understated his taxable income and consequent tax liability for the years 1962 and 1963. The jury acquitted as to 1962, but returned a verdict of guilty on the 1963 count. We affirm.

Elmore's assigned errors and the context in which they arose are set forth below.

### I

At trial the government employed the net worth plus nondeductible expenses method in order to establish its case. As a part of this process evidence of Elmore's reported and corrected taxable income and expenditures during 1962 and 1963 was introduced. He claims that two items of evidence were improperly admitted against him.

The first was a notebook which the government subpoenaed from a woman who had been Elmore's receptionist in 1962–1963. The notebook contained data relating to his travel expenses. Elmore claimed that the notebook was his personal property and moved to suppress. At the hearing on the motion the district judge indicated that he would "probably" admit the evidence if and when it was offered, but he apparently made no formal ruling on the matter at that time. When the government subsequently offered the notebook at trial, however, defense counsel stated that he had no objection to its admission.

██ We think that under these circumstances the affirmative statement that defendant did not object constituted a conscious and knowing relinquishment of any right to have the notebook suppressed. Lawn v. United States, 355 U.S. 339, 353–355, 78 S.Ct. 311, 2 L.Ed. 2d 321 (1958); Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). But in any event, despite some self-contradiction, the receptionist's testimony taken as a whole makes it clear that the records in the notebook were compiled on her own initiative to assist her in the performance of her own duties. Therefore, we conclude that the records were not Elmore's private books and that their compulsory production did not violate any constitutional stricture.[1] Cf., Boyd v. United States, 116 U.S. 616, 634–635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

The government also introduced a document in which Elmore's son-in-law, Patrick West, had recorded mortgage payments which Elmore had made to West.[2] The district court admitted the document on the theory that it was characterized by sufficient "guarantees of trustworthi-

---

1. Elmore's constitutional claim is not stated with precision and is unclear to us. If he is claiming that the subpoena constituted a search without a warrant or probable cause, we think that the claim is without merit.

2. The government actually introduced a photocopy of the document which had been made by an Internal Revenue Service agent. The defendant at trial and here made no objection to the fact that a copy was used.

ness" to take it out of the hearsay rule. This conclusion appears to have been rested on two grounds: (1) the federal business records statute, 28 U.S.C.A. § 1732, and (2) the exception to the hearsay rule for declarations against interest.[3]

■ We need not decide whether or not this document would be admissible under § 1732, for we have concluded that it constitutes a declaration against West's pecuniary interest. The document is a declaration by West that the debt which Elmore owed him had been reduced by the amount of the recorded payments. The requirement that the declarent be unavailable to testify is satisfied by the fact that West successfully asserted his fifth amendment privilege against self-incrimination and declined to answer any questions about the matter. McCormick, Law of Evidence (1954 ed.) § 257, at 554 n. 11. Finally, on cross-examination Elmore himself identified the document and admitted all of the payments which it disclosed.

## II

Elmore also claims that the government violated the principle enunciated in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing, upon request, to disclose material evidence favorable to the accused.

At trial the government attempted to prove that Elmore had received unreported taxable income from bribes which he accepted as commissioner of the West Virginia Alcohol Beverage Control Commission. The government called as a witness a certain Brawley, who had been employed during 1963 by a distilling company. Brawley testified that he and his superior, a man named Manning, paid Elmore a $500 bribe in 1963 to secure the privilege of having their brand of liquor sold in the West Virginia state liquor stores. According to Brawley, Manning obtained the $500 from the company but the source within the company was not disclosed.

Brawley was then permitted to testify to a similar bribe in 1964. At that time a check for $500 had been made out by the president of the company, John Turner, and made payable to Manning. Brawley did not say why Turner sent this check to Manning, but he did testify that on the latter's orders he cashed the check and arranged for the proceeds to be delivered to Elmore in return for a continuation of the privilege of doing business in the state liquor stores.

Brawley was apparently a surprise witness, and we assume that prior to his appearance on the stand the defense had no reason to expect that Manning and Turner were in any way relevant to the case. During the four days which followed Brawley's testimony, defense counsel attempted to find, interview, and subpoena Manning and Turner. Manning was located, and the defense expected to present him as a witness, but for reasons which do not appear in the record he never took the stand.

Turner could not be located, however. Counsel then repeated an unsuccessful pretrial motion for the production and disclosure of any exculpatory statements made by Turner.[4] The government responded by disclosing a pretrial statement made by Turner to an Internal Revenue Service agent. In this statement Turner claimed that he had intended the 1964 check to be used as a political contribution to the Democratic Party, of which Elmore was an official. He

---

3. The district judge seemed to rely primarily on § 1732. Nevertheless, on two occasions he noted that the document contained information which was financially adverse to West. Even if the decision was bottomed solely on § 1732, we could sustain the admission of the document on the basis of a ground that the district judge did not consider—regardless of the correctness of the ground upon which he actually relied. McCormick, Law of Evidence (1954 ed.) § 52, at 118 n. 26.

4. Defense counsel expressly declined to make any such motion with respect to Manning because he was expected to appear. The government informed the district court that it had no statements by him.

also denied that bribery was his purpose.[5] Defense counsel then moved for a directed verdict or a mistrial on the ground that the government's belated disclosure violated *Brady*.[6] We think the district court's denial of the motion was correct.

In *Brady* the Supreme Court held that the prosecutor has a duty, upon request, to disclose material evidence favorable to the accused. On two occasions we have applied this doctrine. Hamric v. Bailey, 386 F.2d 390, 392–393 (4 Cir. 1967); Barbee v. Warden, 331 F.2d 842, 847 (4 Cir. 1964). See also United States ex rel. Meers v. Wilkins, 326 F.2d 135 (2 Cir. 1964). In all three of these cases, however, the government did not disclose exculpatory information in its possession either before or during trial. In each the information suppressed was unquestionably exculpatory; here its excusatory effect was more questionable.

In *Hamric* we held that "disclosure to be effective must be made at a time when the disclosure would be of value to the accused." 386 F.2d at 393. *E. g.*, United States v. Gleason, 265 F.Supp. 880, 885 (S.D.N.Y. 1967). Manifestly, a more lenient disclosure burden on the government would drain *Brady* of all vitality. Against the background of this holding, Elmore claims that disclosure here was of no value to him because it came so late in the trial that he was unable through due diligence to secure Turner's presence. Turner's relevance was first disclosed in Brawley's testimony on September 16, 1968. The defense opened its case on September 19. The trial ended on September 25. During the interim the court recessed for two full days and for most of a third. Even if we assume, however, that this time was insufficient for reasonable efforts to be successful, we note that defense counsel did not request a continuance for whatever further time might have been necessary.

Furthermore, under these circumstances we think that at the most the government should have only been required under *Brady* to disclose Turner's statement after Brawley had testified. If the statement had been produced in response to Elmore's pretrial motion for disclosure, there was a substantial probability that Brawley would have been suspected as a surprise hostile witness.[7] This would have created a possibility of intimidation of Brawley. In this case the government's concern to protect its case from such influences was justifiable. At a pretrial hearing evidence was introduced that in a previous case Elmore had attempted to intimidate government witnesses and agents. Although the district court did not expressly rely on this evidence in denying Elmore's pretrial motion, we are not precluded from resting upon it, especially when the defendant does not question its accuracy. *Cf.*, McCormick, Law of Evidence (1954 ed.) § 52, at 118 n. 26.

The government should have promptly disclosed the statement as soon as Brawley was called as a witness. At that point there was no further justification for withholding it, and we do not think

---

5. Turner refused to make this statement under oath and declined to submit an affidavit until he had consulted with his lawyer. No affidavit appears in the record. These facts suggest that if called as a witness, Turner may have claimed his right not to incriminate himself.

6. At trial and on appeal Elmore contends that the government had earlier asserted that it possessed no exculpatory statements, but he points to nothing in the record to sustain this assertion and we have found nothing. In fact, the government's consistent position before trial was

that Elmore was not entitled to disclosure at that time.

7. Elmore does not claim on this appeal that the government should have disclosed the names of its witnesses before trial. See United States v. Chase, 372 F. 2d 453, 466 (4 Cir.), cert. den., 387 U.S. 907, 87 S.Ct. 1688, 18 L.Ed.2d 626 (1967). But see *e. g.*, People v. Lopez, 60 Cal.2d 223, 32 Cal.Rptr. 424, 384 P.2d 16, 28–30 (1963), cert. den., 375 U.S. 994, 84 S.Ct. 634, 11 L.Ed.2d 480 (1964); Brennan, Remarks on Discovery, 33 F.R.D. 47, 65 (1963).

that the government should be allowed to await a repeat request. *Cf.*, Fed.R. Crim.P. 16(g). Nevertheless, the unjustifiable delay of which the government was guilty in this case did not prejudice the defendant, for Turner's relevance was disclosed by Brawley's testimony, Elmore's efforts were promptly undertaken to secure Turner's appearance, and the statement was produced well before the end of the trial. Fed.R. Crim.P. 52(a); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Finally, aside from the risk that if produced as a witness Turner might have invoked his constitutional right not to testify, he would have been of little assistance to Elmore even if he had testified that the check was given to Manning to deliver as a campaign contribution and not as a bribe. Such testimony would not necessarily have contradicted Brawley because Manning could have used the funds for a bribe even though Turner intended them as a political contribution. Also, Brawley only testified that the funds came from Turner and did not attempt to identify Turner's purpose. Moreover, for the same reason, Turner could not have provided strong support for Elmore's assertion that the 1964 money was offered by Manning and accepted by him as a political contribution. In short, the slim exculpatory effect of Turner's testimony adds additional support for our conclusion, stemming from the other considerations that we have discussed, that Elmore was not denied a fair trial in violation of *Brady*.

### III

In his closing arguments to the jury, the government prosecutor made several intemperate assertions which the defendant claims were so inflammatory and prejudicial as to deny him a fair trial.[8] Repeatedly the prosecutor asserted that the defendant had been "dipping into the till" as an official of the Democratic Party. These remarks finally led him to ask the jurors "if you were contributing money to the party of your choice, would you want your funds to go through the hands of this defendant?" He also made reference to "evidence of kickbacks, payoffs, graft," "bribery payments," "crimes of theft and also of embezzlement." After reminding the jurors that corruption in government is expensive, he urged them to "strike a heavy blow at that evil * * *." As the district court indicated, a series of disclosures of corruption in West Virginia had created an unusual public sensitivity to such charges and thus increased the possibility of prejudice. Nevertheless, he denied the defendant's motion for a new trial.

We disapprove of the prosecutor's remarks. As the Supreme Court held in Berger v. United States, 295 U.S. 78, 85, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the prosecutor has a constitutional duty to refrain from "insinuations and assertions calculated to mislead the jury * * * [and] produce a wrongful conviction." The remarks here were intemperate, unnecessary, and unjustifiable. They needlessly and improperly created a possibility of prejudice to the defendant. We are satisfied, however, that actual prejudice did not occur so that reversal would *only* serve the purpose of punishing the prosecutor. For this purpose a reversal would be, in Judge Learned Hand's words, "an immoderate penalty." United States v. Lotsch, 102 F.2d 35, 37 (2 Cir.), cert. den., 307 U.S. 622, 59 S.Ct. 793, 83 L.Ed. 1500 (1939).

Much of the possibility of prejudice created by these remarks could have been prevented or at least ameliorated had defense counsel promptly attempted to intervene and object. Instead, counsel sat silently throughout the entire summation. Only at its conclusion did counsel act, and then it was not to request cautionary instructions, but, to move for a mistrial.

---

**8.** Elmore also complains of inflammatory remarks made during the trial, but the only remarks which he specifies were made outside the presence of the jury.

In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238–239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940), the Supreme Court held that

"[C]ounsel for the defense * * * cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial."

See also Birnbaum v. United States, 356 F.2d 856, 866 (8 Cir. 1966); United States v. Ramos, 268 F.2d 879, 880 (2 Cir. 1959). We think that the concern for judicial efficiency and adversary fairness which the *Socony* Court evidenced also requires defense counsel promptly to make his objection known so that the district judge can quickly caution the jury and prevent further prosecutorial intemperance.

In *Socony*, however, the Supreme Court also indicated that even in the absence of a timely objection an appellate court could in "exceptional circumstances" notice intemperate remarks if they were "obvious, or if they otherwise seriously affect[ed] the fairness, integrity or public reputation of [the] judicial proceedings." 310 U.S. at 239, 60 S.Ct. at 851. The Court also held that a prosecutor's statements can be "undignified and intemperate" and fail to "comport with the standards of propriety to be expected" without prejudicing the defendant:

"[E]ach case necessarily turns on its own facts. And where * * * the record convinces us that these statements were minor aberrations in a prolonged trial and not cumulative evidence of a proceeding dominated by

passion and prejudice, reversal would not promote the ends of justice." *Id.,* at 239–240, 60 S.Ct. at 852.

We think that this conviction survives these various standards. First, a reading of the entire argument before the jury leaves us with the "firm conviction" that the prosecutor's intemperate remarks were relatively "isolated" and "not at all reflective of the quality of the argument as a whole." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 242, 60 S.Ct. 811, 853, 84 L.Ed. 1129 (1940). The remarks of which Elmore complains comprise at most only about a dozen lines in approximately forty-five pages of government summation. See United States v. Ramos, 268 F.2d 879, 880 (2 Cir. 1959). Furthermore, the district judge, whose feel for the realities of this episode was necessarily more acute than our own, concluded that the remarks were not "that prejudicial" so as to warrant a new trial. In short, this case is a far cry from *Berger* where the Supreme Court found that prosecutorial "misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."

295 U.S. at 89, 55 S.Ct. at 633, 79 L.Ed. 1314. See also e. g., Viereck v. United States, 318 U.S. 236, 247–248, 63 S.Ct. 561, 87 L.Ed. 734 (1943) (dictum); Wallace v. United States, 281 F.2d 656, 667–668 (4 Cir. 1960); United States v. American Die and Instrument Works, Inc., 213 F.2d 731, 732–734 (3 Cir. 1954).⁹

Second, the district judge's instructions were sufficient to dissipate most if not all of whatever prejudice had

---

9. In *Berger* the Supreme Court suggested that "[i]f the case against Berger had been strong, or * * * the evidence of his guilt 'overwhelming,'" his conviction might not have been reversed for improper remarks. 295 U.S. at 89, 55 S.Ct. at 633. On this record we cannot appraise the strength of the case, and its strength, or lack thereof, is not a factor in our decision. That it is not a strong case is suggested by the fact that the jury acquitted on the 1962 count on much of the same evidence on which it convicted for 1963. But the 1963 count was a stronger case because of the addition of the testimony of Brawley. Thus, the whole case rested upon an assessment of the credibility of Brawley, the defendant, and others, as the district judge repeatedly emphasized in his instructions and these are factors that we cannot assess.

been engendered. He carefully defined the elements of the offense of tax evasion. Beard v. United States, 222 F.2d 84, 95 (4 Cir.), cert. den., 350 U.S. 846, 76 S.Ct. 48, 100 L.Ed. 753 (1955). He cautioned the jury not to concern itself "with the mores of the operation of the Democratic Party or the handling of political contributions." He also advised the jury on the limited relevance of Brawley's testimony. Finally, one of the government attorneys fully explained to the jury that the only crime that they should consider was federal tax evasion.

While these instructions omitted any specific caution to the jury with respect to the prosecutor's remarks, we think that defense counsel was at least partially responsible for this omission. Although counsel indicated after he moved for a mistrial that he wanted a specific charge, from later events the district judge was understandably left with the impression that the defense did not want the matter brought to the jury's attention again, as defense counsel himself admitted at trial. *Cf.*, Johnson v. United States, 318 U.S. 189, 201, 63 S.Ct. 549, 87 L.Ed. 704 (1943). In any event, since the jury acquitted on one of the two counts, we are not without some assurance that the instructions which were given were adequate to ensure that the jury was not diverted from its duty. Beard v. United States, 222 F.2d 84, 95 (4 Cir. 1955).

Finally, the prosecutor's several references to corruption rested on "a reasonable basis in the evidence," as Brawley's testimony, for example, indicated, and the government was entitled to make some reference to these matters since they related to the source of the unreported income. United States v. Sawyer, 347 F.2d 372, 374 & n. 5 (4 Cir. 1965).

## IV

Lastly, Elmore claims that the jury verdicts of acquittal on count one and guilty on count two were inconsistent. This claim is without merit. A sufficient answer is to repeat that

Brawley's testimony related only to the 1963 count and that the district judge repeatedly instructed the jury to consider the two counts separately.

Affirmed.